ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NANCY PETRELLA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 19-2208 |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| APPOQUINIMINK SCHOOL DISTRICT, | ) | |
| and THE BOARD OF EDUCATION OF | ) | |
| APPOQUINIMINK SCHOOL DISTRICT, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Nancy Petrella complains against Appoquinimink School District and the Board of Education of Appoquinimink School District (collectively the "District") as follows:

### Parties

1. At all times relevant to this action, Ms. Petrella was a resident of New Castle County, Delaware, with a mailing address of 55 W. 8th Street, New Castle, DE 19720.

2. The District is a political entity and subdivision of the State of Delaware organized pursuant to Title 14, Chapter 10, of the Delaware Code and may be served by serving the Superintendent of Appoquinimink School District at the Appoquinimink School District Administrative Office, 313 South Fifth Street, Odessa, Delaware 19730.

3. The Board is the governing body of the District, a political entity and subdivision of the State of Delaware organized pursuant to Title 14, Chapter 10, of the Delaware Code and may be served by serving the Superintendent of Appoquinimink School District at the Appoquinimink School District Administrative Office, 313 South Fifth Street, Odessa, Delaware 19730.

## Jurisdiction and Venue

4. Ms. Petrella brings this action for disability discrimination and failure to accommodate under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101, *et seq.*, (the "ADA") for damages exceeding $283,000 including, but not limited to, back and front pay.

5. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 42 U.S.C. § 12117(a) because Ms. Petrella's cause of action arises under the laws of the United States.

6. This Court has jurisdiction over the claims asserted herein as Ms. Petrella worked in Delaware, and Defendants are employers in Delaware under the ADA.

7. Venue is proper in the District of Delaware as the events that lead to the following cause of action took place within the boundaries of that District.

## Right to Sue

8. Ms. Petrella timely submitted a complaint of discrimination on the basis of disability to the Equal Employment Opportunity Commission.

9. Ms. Petrella has timely filed this Complaint within ninety (90) days of her receipt of the Notice of Right to Sue.

## Statement of Facts

### A. Ms. Petrella's Employment with Defendants and Subsequent Need for a Medical Leave of Absence

10. Ms. Petrella began working for the District on May 1, 2000, as the Art Teacher at Silver Lake Elementary School upon completing her student teaching and course requirements for certification at Delaware State University. She later transferred to Meredith Middle School in 2008. Ms. Petrella is passionate about her work and helping her students learn about and

appreciate art.

11. Ms. Petrella also served the District performing administrative functions. Ms. Petrella had been recruited by the district superintendent and assistant superintendent to serve on the International Education Advisory Board ("IEAB"), which was focused on globalization and 21st century learning skills. While serving on the IEAB, she was made chairperson for the International Artist in Residence Program and served as a mentor for new teachers and student teachers.

12. In 2005, she also began working with the international education initiative, International Education and Resources Network ("iEARN"), which originated in New York City and has chapters in 148 countries. Through that organization she took a professional development course, worked with educators throughout the world, and involved her students in global projects and collaborations with teachers and students in other countries. After completing her coursework, she was asked to mentor other Delaware teachers participating in the program.

13. Beginning in 2007, she was recruited by iEARN to co-teach a professional development course in project based learning and arts integration to international educators. In addition, she also worked at the state level on curriculum development.

14. While serving on the International Education Advisory Board, she designed an art exchange program and coordinated with a representative in Italy, Alberto Giannetti, who brought her to the city of Volterra to present the idea to its mayor and bank president. For the program, she acted as liaison between the Italian representatives, the District, and, subsequently, the people of Middletown, Delaware.

15. As part of the exchange program, Ms. Petrella organized an art exhibit at the

Biggs Museum in Dover, Delaware, which included historical pieces from Pisa, student works, and the works of maestro Roberto Chiti, the visiting artist who taught Appoquinimink students the art of sculpting in alabaster. The exhibit took place in the spring of 2009 and was the single biggest day the Biggs Museum ever had at that point. Ms. Petrella threw herself headlong into this project, while maintaining her regular course load. By the end of the project, she had worked herself to exhaustion.

16. During the 2009-2010 school year, as well as the two school years that followed, the conditions of Ms. Petrella's employment became increasingly stressful. Mr. Carlton Parker and Dr. Thomas Vari became her supervisors, serving as Principal and Assistant Principal at Meredith Middle School, respectively. Ms. Petrella's classes were overcrowded, and to make matters worse, the administration would add students to her roster without notifying her in advance. This caused Ms. Petrella much anxiety. At one point, she had eight middle-school aged boys in her class who made constant trouble in her classroom. Soon their conduct became abusive toward Ms. Petrella – they would verbally harass her, making sexually derogative comments and otherwise disrupting the classroom environment. Ms. Petrella followed the proper reporting procedures at the District for documenting the student behavior and meting out discipline where warranted. The students began complaining to the administration, specifically Dr. Vari and the District's HR representative, Matthias Fallis, who responded by taking disciplinary action against Ms. Petrella.

17. Unfortunately, the students' behaviors continued to escalate over the course of the school years. In the first trimester of the 2011-2012 school year, one student in particular made a sexually explicit comment to her in front of the class about her and Dr. Tony Marchio, the District Superintendent at the time. Ms. Petrella had come to suspect Dr. Vari was antagonizing

4

the students and attempting to undermine her authority in the classroom by undoing her efforts to discipline the students and manage her classroom. When Ms. Petrella reported this harassing comment, Mr. Parker reprimanded her and asked her what *she* did wrong to provoke the harassment. The administration also falsely accused her of yelling at the students. Several students wrote her notes of support and left supportive messages for her on her classroom chalkboard. But, instead of properly investigating the reports and providing the support Ms. Petrella needed, the administration chose to abuse her, continue to undermine her authority with her students, and discipline her. This continued during the 20111-2012 school year and came to a head in the first two months of the 2012-2013 school year, by which time she had become overwhelmed and traumatized.

18. The lack of support from the administration that created the unmanageable situation in her classroom, the mental abuse, along with the residual fatigue from planning and implementing the Italian Artist in Residence Program, led Ms. Petrella to have a nervous breakdown. By mid-October, 2012, her treating psychiatric nurse practitioner, Dr. Darlene Annas, diagnosed Ms. Petrella with major depression disorder, post-traumatic stress disorder, and general anxiety disorder as a result of the continued abuses at work, and she insisted Ms. Petrella take a leave of absence. Ms. Petrella was also receiving treatment from licensed clinical psychologist, Dr. Mladen Milic, who (along with other medical professionals) around this time strongly suspected and eventually diagnosed Ms. Petrella with Asperger's Syndrome ("Asperger's").

19. In an October 12, 2012 email to Mr. Fallis, Dr. Vari, and other administrators at the District, Ms. Petrella requested a leave of absence for her depression. She also verbally disclosed her diagnoses, including her Asperger's, to District administrators, including Mr.

5

Fallis, Dr. Vari, Dr. Sharon Pepukayi, and Dr. Chuck Longfellow. Mr. Fallis told Ms. Petrella she was never to disclose her condition to anyone.

20. In further correspondence with the District, on October 14, 2012, Ms. Petrella sent a letter to the District attempting to explain her condition and how it was affecting her behavior at work.

21. For example, Ms. Petrella informed Mr. Fallis that her condition was causing her to be unable to clearly recall information. In addition, Ms. Petrella explained that her condition was leading her to call for extra support from the administration in handling the students' behaviors and that, because of her depression, she "simply need[s] support from someone." She also explained that this need for an accommodation was "directly related to Asperger's" and expressed dismay that when she communicated this need in a meeting with the Meredith administration, she received no response.

22. Ms. Petrella's leave of absence began on October 17, 2012. Her leave of absence was to recover from depression caused by the hostile work environment that she had been forced to endure since the 2009-2010 school year.

23. During her leave of absence, she continued to treat with Dr. Annas and Dr. Milic, who confirmed her diagnoses, including the Asperger's diagnosis. Through her therapy sessions with Dr. Milic, Ms. Petrella learned that her Asperger's was affected by the hostile work environment and her resulting depression. While Ms. Petrella had always lived with Asperger's and had developed coping mechanisms in interacting with others, the harassment and abuse she suffered from at work rendered her incapable of successfully managing her Asperger's, contributing to the problems the District administration perceived.

24. For example, the unannounced addition of students to her roster, and the

unjustified implementation of discipline against her for attempting to follow the rules in reporting disruptive student behavior and harassment, triggered her Asperger's in a way that she was no longer able to address with the coping mechanisms she had developed throughout her life. Her treating physicians worked with Ms. Petrella to come to understand her diagnosis and to work through her symptoms.

### B. Ms. Petrella's Attempts to Return to Work and Requests for Accommodations

25. As she neared the end of her leave of absence in March 2013, Ms. Petrella discussed with her physicians her return to work. Dr. Milic felt that in order for Ms. Petrella to return to work, she would need certain accommodations for her Asperger's. Dr. Milic began identifying possible accommodations, such as: (1) advanced notice for events like meetings (especially meetings to discuss discipline) or when a student would be added to her classroom; (2) additional time to process information and instructions from the District; and (3) the designation of a liaison or someone who could serve as an advocate for her when she felt she needed assistance with communicating with the District. Dr. Milic also began preparing Ms. Petrella to have a conversation with the District about her need for these accommodations.

26. On March 18, 2013, Ms. Petrella emailed Mr. Fallis to inform him that her doctors had cleared her to return to work on March 28, 2013. Mr. Fallis responded that she needed to provide medical certification that she could return to work "with no restrictions." This confused Ms. Petrella, who understood from her therapist that her return to work would require certain accommodations.

27. Ms. Petrella asked via email on March 20, 2013 whether she could return to a different building (so as to avoid triggering interactions with the students and administrators who had harassed and belittled her). This request was denied, and Mr. Fallis reiterated that she

needed to return without restrictions and "under the same conditions when [she] left."

28. Understanding that this meant that the District would not entertain any requests for accommodations that would allow her to return to her position at Meredith Middle School, Ms. Petrella responded that she could not provide such a medical certification "with no restrictions" as the District was insisting upon.

29. Ms. Petrella again notified the District that she was able to return to work on or around April 8, 2013, to which the District responded that "nothing had changed," and so long as she was not cleared to return to work "without restrictions," she could not return to work.

30. The District terminated her employment effective April 17, 2013.

31. The District's refusal to entertain any accommodations or engage in the interactive process caused a major setback in Ms. Petrella's mental and emotional health. Her therapist, Dr. Milic, observed that it became extremely difficult to prepare Ms. Petrella to return to work once her attempt to address the accommodations she needed was rejected.

### C. Ms. Petrella's Long Term Disability Denial

32. According to the District's policy at the time, and as stated in the April 16 termination letter, Ms. Petrella continued to be eligible to apply for long term disability benefits. The maximum period of long term disability benefits was two years.

33. The April 16 termination letter also stated that if Ms. Petrella was released to work "without restrictions" during the two year period for long term disability benefits, she would be considered for any opening in the District for which she qualified and interviewed.

34. Ms. Petrella applied for long term disability on or around April 25, 2013. The State of Delaware was the policy holder on the insurance policy.

35. Ms. Petrella received long term disability benefits for the period April 17, 2013 to

June 30, 2013, related to her diagnoses of major depressive disorder, generalized anxiety disorder, post-traumatic stress disorder, and Asperger's.

36. On July 9, 2013, however, the District's long term disability insurance carrier denied Ms. Petrella's further eligibility for long term disability benefits because it found that she was able to perform her essential job duties as of July 9, 2013.

37. On July 20, 2013, Ms. Petrella emailed Dr. Pepukayi that she was applying for a new job. Ms. Petrella stated in the email that she had missed the deadline for Maple Lane Elementary (a school within the Brandywine School District) but told Dr. Pepukayi that she might be contacted by other possible employers. Ms. Petrella followed up her email on July 22, 2013 by sending her resume for Dr. Pepukayi's review.

38. On August 11, 2013, Ms. Petrella emailed Mr. Fallis, Dr. Vari, and Dr. Pepukayi with a copy of her resume and a letter of recommendation that she asked to be placed in her employment file with the District. While she did not expressly state that she was seeking employment within the District, by this point (and perhaps earlier based on Ms. Petrella's contacting Dr. Pupkayi in July 2013) the District was aware that Ms. Petrella was no longer on long term disability and was seeking employment.

39. Mr. Fallis responded to Ms. Petrella on August 12, 2013, refusing to place the resume or the letter of recommendation in her file because she was "no longer employed." He wished her luck in pursuing a new position and stated that the District would transfer her file to her new school should she "find a new position in the State of Delaware."

40. Despite being aware that Ms. Petrella was no longer on long term disability and was seeking employment as a teacher, the District did not attempt to reinstate her.

9

### D. Ms. Petrella's Damages and Mitigation Efforts

41. Following this turn of events – all of which could have been avoided if the District had engaged in the interactive process as required by law – Ms. Petrella's mental and emotional health plummeted. Her termination and subsequent denial of disability benefits caused her to lose medical insurance. In her attempts to secure medical insurance, Ms. Petrella was unable to afford health insurance premiums, and was denied Medicaid benefits. Later, in the summer of 2015, she learned that according to her income tax returns, she and her family were living below the poverty line. Ms. Petrella was unable to afford the proper medical care to save her eyesight, which had begun to deteriorate due to Macular Degeneration. This loss of employment and medical insurance delayed her ability to seek medical and dental care, leading to complications including glaucoma.

42. Due to her termination and subsequent loss of medical insurance, Ms. Petrella was no longer able to access psychiatric care, which worsened her mental state, causing severe emotional distress.

43. Following her termination, despite her efforts, Ms. Petrella was unable to find employment until August 2015. Ms. Petrella had been applying to positions both locally and in other states. Ms. Petrella began to believe that her efforts to find a job were being undermined by the District. For example, at a job conference in Washington, D.C., Ms. Petrella was interviewed by a representative of the Garrison Forrest School. During the interview, she was only asked about why she was no longer working for Appoquinimink. The interviewer never asked her anything about her teaching philosophy, style, lesson planning, or even art in general. The interviewer ended the interview by saying, "We just wanted to hear your side of the story," leaving Ms. Petrella with the impression that the potential employer had already heard negative

information about her from the District.

44. Ms. Petrella finally found a part time teaching job through a family friend with a private school in Delaware in August 2015, where she worked part-time through the end of the 2016-2017 school year, earning substantially less than she was with the District.

45. In August 2017, Ms. Petrella became employed as an art teacher at a Delaware charter school. Because Ms. Petrella had a three-year gap in her employment with the State of Delaware, she was unable to qualify for the Masters +30 credits salary level at the charter school. Had she not lost that status, she would have been grandfathered into the program (just as her similarly-situated fellow colleague at Meredith Middle School had been), as she was working toward her Master's Degree during her employment with the District and completed the degree in 2013.

46. Related to the loss of seniority with the State of Delaware, she was no longer able to qualify for full health insurance coverage upon retirement.

**COUNT I – Failure to Engage in Interactive Process and to Provide Reasonable Accommodation under the ADA**

47. Ms. Petrella re-alleges and incorporates by reference all allegations and paragraphs in this Complaint above and below as though fully set forth herein.

48. At all relevant times, Ms. Petrella, as a person diagnosed with Asperger's, was a disabled person within the meaning of the ADA.

49. At all relevant times, Ms. Petrella was qualified to perform the essential job functions of an art teacher, with or without an accommodation.

50. Ms. Petrella informed the District of her need for reasonable accommodations due to her disability (Asperger's) in March 2013.

51. The District denied Ms. Petrella any reasonable accommodations by requiring her return to work "without restrictions," by rejecting her request for accommodations, and by failing to engage in the interactive process required by the ADA.

52. The District's refusal to engage in good faith in the interactive process and failure to provide Ms. Petrella with any reasonable accommodations caused a major setback in her emotional and mental state, worsening her major depressive disorder and generalized anxiety disorder, and causing monetary damages.

## COUNT II – Discrimination under the ADA

53. Ms. Petrella re-alleges and incorporates by reference all allegations and paragraphs in this Complaint above and below as though fully set forth herein.

54. At all relevant times, Ms. Petrella, as a person diagnosed with Asperger's, was a disabled person within the meaning of the ADA.

55. At all relevant times, Ms. Petrella was qualified to perform the essential job functions of an art teacher, with or without an accommodation.

56. Ms. Petrella's disability was a determinative factor in the District's decision to terminate her employment in that the District conditioned her return to work from medical leave on the absence of her need for accommodations.

57. As a result of her termination, Ms. Petrella suffered damages in the form of loss of income, loss of access to health insurance and health care, loss of access to seniority and retirement benefits with the State of Delaware, and a severely worsened emotional and mental state. Ms. Petrella is seeking the recovery of her lost wages as well as compensation for her emotional distress, as evidenced through the therapy she received following her termination.

**WHEREFORE**, Ms. Petrella respectfully requests this Court enter judgment in her favor and as follows:

a. Entering judgment against Defendants for violation of the ADA and awarding all relief available under the ADA, including back and front pay, and compensatory and punitive damages;

b. Awarding Ms. Petrella her reasonable attorneys' fees pursuant to the ADA;

c. Awarding Ms. Petrella pre and post judgment interest; and

d. Ordering any other relief that the Court deems just and appropriate.

/s/ Nancy Petrella
Nancy Petrella
55 W. 8th St.
New Castle, DE 19720
Phone: 302 328 0155
Mobile: 302 229 2602
n.petrella@comcast.net

Dated: November 27, 2019